# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### November 9, 2000 Session

## LETA HOALCRAFT v. WALTER TROY SMITHSON

**Appeal from the Circuit Court for Williamson County**
**No. 91068     Russ Heldman, Judge**
_____

**No. M2000-01347-COA-R10-CV - Filed July 10, 2001**
_____

This Tenn. R. App. P. 10 extraordinary appeal marks the third time this hotly contested child custody dispute has been before this court. In the first appeal, this court reversed the trial court's decision to ignore his predecessor's final order awarding custody of the children to their mother and to place the children in their father's custody. *Hoalcraft v. Smithson*, 19 S.W.3d 822 (Tenn. Ct. App. 1999) ("*Hoalcraft v. Smithson I*"). In the second appeal, this court reversed the trial court's order requiring the mother to pay the father child support. *Hoalcraft v. Smithson*, No. M1999-00143-COA-R3-CV, 2000 WL 225583 (Tenn. Ct. App. Feb. 29, 2000) (No Tenn. R. App. P. 11 application filed) ("*Hoalcraft v. Smithson II*"). In this appeal, the mother asserts that the trial judge erred by (1) deciding to relitigate the custody issue, (2) disqualifying her lawyer for perceived ethical violations, and (3) refusing to disqualify himself from further proceedings in this case. We have determined that the father is entitled to a hearing on his motion for change of custody limited to facts occurring after January 1999. We have also determined that the trial court erred by disqualifying the wife's lawyer and that the record contains evidence that provides a reasonable basis for questioning the trial judge's impartiality.

**Tenn. R. App. P. 10 Appeal by Permission; Judgment of the Circuit Court Reversed**

WILLIAM B. CAIN,, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR. and PATRICIA J. COTTRELL, JJ., joined.

R. E. Lee Davies, Franklin, Tennessee, for the appellant, Leta Hoalcraft.

Virginia Lee Story, Franklin, Tennessee, for the appellee, Walter Troy Smithson.

### OPINION

This case presents serious questions relative to the administration of justice in accordance with long-settled rules of law. The trial court's actions at issue on this appeal can only be understood in the context of the matters dealt with in prior appeals. Accordingly, this opinion is extended beyond what would ordinarily suffice to dispose of the issues before the court.

Because we are compelled by the record in this case to reverse the action of the trial court in disqualifying counsel for Mrs. Hoalcraft and further find it necessary to disqualify the trial judge from all further proceedings in this case, we wish to avoid any possibility of taking out of context any pronouncement made by the trial judge appearing in this record. We therefore choose to reproduce as an appendix to this opinion verbatim, all orders and memoranda of the trial judge reflecting his actions and forming the basis for our actions. Reference in the opinion to matters appearing in the appendix are appropriately footnoted in the opinion, and a thorough reading of the entire appendix is helpful in understanding the opinion.

Walter Troy Smithson and Leta Hoalcraft were divorced in the Circuit Court for Williamson County on December 16, 1988. By agreement, Mrs. Hoalcraft received sole custody of the parties' two minor children. Neither party appealed from this decree. Both parties eventually married other persons.

In 1997, Mrs. Hoalcraft's husband received a three-year employment assignment in Thailand.[1] Mrs. Hoalcraft decided that she and her children would accompany Mr. Hoalcraft, and so she filed a petition seeking permission to relocate the children to Thailand until 2001 when she and Mr. Hoalcraft planned to return to Tennessee. Mr. Smithson objected to the relocation and filed a petition seeking a change of custody. He also stopped paying his court-ordered child support in June 1997. The trial judge conducted a hearing on July 3, 1997. After the trial judge announced that he was authorizing Mrs. Hoalcraft to take the children to Thailand, Mr. Smithson assaulted not only Mr. Hoalcraft but a court deputy who attempted to intervene.[2]

On July 17, 1997, the trial court entered an order authorizing Mrs. Hoalcraft to take the children to Thailand and denying Mr. Smithson's petition for change of custody on the ground that there had been no material change in the children's circumstances. This order also states that the case "shall be placed on the review docket in the summer of 1998 when . . . [Mrs. Hoalcraft] returns from Thailand with the children."[3] Mrs. Hoalcraft and the children moved to Thailand in the summer of 1997, and Mr. Smithson did not appeal from the decision permitting Mrs. Hoalcraft to relocate the children to Thailand and denying his petition for change of custody. In Thailand, Mrs. Hoalcraft and the children lived in an exclusive condominium-like community, and the children attended an exclusive international school. The children were also involved in numerous extracurricular activities, including band, tennis, and horseback riding.[4]

Mrs. Hoalcraft brought the children back to Tennessee during the summer of 1998 to enable

[1]*Hoalcraft v. Smithson*, 2000 WL 225583, at *2 n.2.

[2]*Hoalcraft v. Smithson*, 19 S.W.3d at 825.

[3]*Hoalcraft v. Smithson*, 19 S.W.3d at 828.

[4]*Hoalcraft v. Smithson*, 19 S.W.3d at 825.

2

them to have a month-long visitation with Mr. Smithson.[5]  By being extremely permissive and indulgent with the children, Mr. Smithson attempted to induce them to tell Mrs. Hoalcraft and the trial court that they wanted to live with him rather than returning to Thailand.[6]  Mr. Smithson had some short-term success because immediately after the visitation, both children exhibited "hateful behavior" toward Mrs. Hoalcraft and asked to remain with Mr. Smithson rather than returning to Thailand. Neither Mr. Smithson nor Mrs. Hoalcraft asked the trial court to revisit the question of custody while Mrs. Hoalcraft and the children were in the United States.  However, in August 1998, before she returned to Thailand, Mrs. Hoalcraft wrote the trial court clerk a letter stating that Mr. Smithson had not paid child support since June 1997.

Judge Henry Denmark Bell, the trial judge who had presided over this case from the beginning retired effective September 1, 1998, and was replaced by Judge Russ Heldman.  On September 10, 1998, the trial court ordered Mr. Smithson to appear to answer Mrs. Hoalcraft's letter regarding his non-payment of child support.  On October 13, 1998, the day he was to appear in court, Mr. Smithson filed another petition seeking a change of custody.  Mrs. Hoalcraft responded with a petition seeking the child support arrearage.

Mr. Smithson also requested the trial court to interview the children in chambers to discuss their preferences about where they wanted to live.  The trial court responded by directing Mrs. Hoalcraft to bring the children to Tennessee during the Christmas holidays to enable him to interview them. This notice contained no indication that anything other than an interview would take place, and neither party expected that the trial court would hold a hearing on custody in addition to the scheduled interviews.[7]

As is common in cases of this sort, the children desired to please both parents and accordingly vacillated back and forth regarding their living preferences.  Approximately two weeks before the scheduled interview, the parties' children sent a letter to the trial court stating that they desired to remain with Mrs. Hoalcraft in Thailand and that Mr. Smithson had pressured them into saying that they wanted to live with him.  They also seemed reluctant to return to Tennessee and told other family members that they preferred to remain with Mrs. Hoalcraft.  When the children returned to Tennessee for Christmas, they stayed with Mr. Smithson immediately before their scheduled interviews with the trial court.  The trial court interviewed the children on January 3, 1998, in the presence of their parents' lawyers but not in the presence of their parents.  During this interview, the children told the trial court that they wanted to remain with Mr. Smithson and that they did not desire to return to Thailand, but they did not express dissatisfaction with the Hoalcrafts or their life in Thailand.[8]

---

[5]Mr. Smithson paid for the children's airfare.

[6]*Hoalcraft v. Smithson*, 19 S.W.3d at 825.

[7]*Hoalcraft v. Smithson*, 19 S.W.3d at 825.

[8]*Hoalcraft v. Smithson*, 19 S.W.3d at 825-826.

During the interviews, the trial judge abruptly decided to conduct a custody hearing the next day. Over the objections of Mrs. Hoalcraft's lawyer, the trial judge indicated that he was disposed to permit the children to remain with Mr. Smithson unless Mrs. Hoalcraft could show that remaining with their father in the United States would be harmful to the children. The trial judge based his action on his conclusion that he had authority to take up the question of custody because his predecessor's July 17, 1997 order granting Mrs. Hoalcraft permission to relocate and denying Mr. Smithson's petition to change custody was not a final order.[9]

During the January 4, 1999 hearing, Mrs. Hoalcraft's lawyer argued that Judge Bell's July 17, 1997 order was final. The trial court asked for an explanation regarding the basis for the lawyer's belief that the order was final. In response, Mrs. Hoalcraft's lawyer stated that his client had inquired about the status of the case while she was in Tennessee during the summer of 1998. The lawyer explained that he contacted Judge Bell to find out whether he intended to hold another custody hearing, and then he recounted that Judge Bell had informed him that "[y]ou don't need to do anything unless there's a problem. . . . If there's a problem from your end, set it for a review." Because there was no problem from Mrs. Hoalcraft's end, she and her lawyer saw no need to request the trial court to review its July 17, 1997 order.

In addition to this colloquy initiated by the trial court, Mr. Smithson presented evidence in an attempt to substantiate the allegations in his petition to change custody. For her part, Mrs. Hoalcraft presented evidence to rebut these allegations, as well as evidence of Mr. Smithson's abusive behavior toward her and the parties' daughter.[10] In addition, she presented evidence refuting the otherwise unsubstantiated allegations that she had a drinking problem and that she was having an extramarital affair. The trial court also heard evidence that the children's living arrangements in Mr. Smithson's home were less commodious than their living arrangements in Thailand.

Despite the absence of credible evidence of materially changed conditions between July 1997 and January 1999, the trial court announced at the conclusion of the hearing that he was awarding "temporary" custody to Mr. Smithson because of the exigent circumstances resulting from the "emotional trauma" that would result if the children were forced to return to Thailand. The trial judge also decided to "set aside" the portion of Judge Bell's July 17, 1997 order denying Mr. Smithson's petition for change of custody and "to allow Mr. Smithson to proceed on a petition for change of custody at a final hearing at a later date."[11]

---

[9]Apparently, the trial judge believed that his predecessor's July 17, 1997 order was not final because it stated that the case would be placed on the "review docket" for the summer of 1998.

[10]The parties' daughter testified that Mr. Smithson became enraged when she told him of her desire to remain in Thailand with Mrs. Hoalcraft and that he told her that she was "no longer part of the family." *Hoalcraft v. Smithson*, 19 S.W.3d 822, 826 (Tenn.Ct.App. 1999), 1999 WL 120667, at *3.

[11]The trial court recited these conclusions in a memorandum filed on January 26, 2000. (Appendix 3-5)

4

The trial court filed an order embodying its decision on January 15, 1999. Even though the order did not finally resolve all the claims between the parties, the trial court certified it as final in accordance with Tenn. R. Civ. P. 54.02.

Mrs. Hoalcraft appealed the January 15, 1999[12] order awarding Mr. Smithson temporary custody of the children. While her appeal was pending, Mr. Smithson requested the trial court to order Mrs. Hoalcraft to pay him child support. At a hearing held in June 1999, Mrs. Hoalcraft testified that she did not have a valid work permit and, therefore, that she was legally prohibited from earning income as long as she was residing in Thailand. She also testified that she and Mr. Hoalcraft would be subject to immediate deportation if she were caught working for wages. Mr. Smithson did not attempt to rebut this testimony. Despite Mrs. Hoalcraft's uncontradicted statements, the trial court concluded that she was voluntarily and wilfully unemployed and ordered her to begin paying Mr. Smithson $554 per month in child support. Mrs. Hoalcraft likewise appealed from this decision.

On December 17, 1999, the Western Section of this court filed an opinion in *Hoalcraft v. Smithson I*, reversing the trial court's January 15, 1999 order. As a threshold matter, the court determined that the trial court had no basis for concluding that its predecessor's July 17, 1997 order denying Mr. Smithson's request for a change of custody was not final. *Hoalcraft v. Smithson*, 19 S.W.3d at 828. The court also found that the trial court had misallocated the well-established burden of proof in cases of this nature by requiring Mrs. Hoalcraft to prove that the children would be harmed if Mr. Smithson were awarded "temporary" custody. *Hoalcraft v. Smithson*, 19 S.W.3d at 830. Finally, the court determined that the evidence did not support the trial court's belief that the children's circumstances had changed materially between July 1997 and January 1999 or that the exigent circumstances required removing the children from Mrs. Hoalcraft's custody and placing them "temporarily" in Mr. Smithson's custody. *Hoalcraft v. Smithson*, 19 S.W.3d at 828-30. Accordingly, the court directed that custody of the parties' children be restored to Mrs. Hoalcraft.

Mr. Smithson thereupon embarked on a strategy intended to frustrate this court's direction in *Hoalcraft v. Smithson I* that "the children be returned to . . . [Mrs. Hoalcraft] at the end of the current school semester." On December 28, 1999, Mr. Smithson filed a motion requesting the trial court to set a date for the final custody hearing. Mrs. Hoalcraft's counsel notified Mr. Smithson's counsel of Mrs. Hoalcraft's position that no further hearings were necessary in light of *Hoalcraft v. Smithson I*.

Mr. Smithson's motion was set for hearing on January 4, 2000; however, on December 28, 1999, Mrs. Hoalcraft's lawyer informed Mr. Smithson's lawyer that he had a trial in another divorce case scheduled for January 4, 2000. Mr. Smithson's lawyer reluctantly agreed to continue the hearing on the motion to set.

---

[12]Because critical trial court proceedings predating this court's opinion of December 17, 1999, occurred in January of 1999 and critical trial court proceedings involved in the present appeal occurred in January 2000, discussion can be confusing if this coincidence is overlooked.

During the call of the motion docket on January 4, 2000, Mr. Smithson's lawyer informed the trial court that she had agreed to continue the hearing on her motion to set to accommodate Mrs. Hoalcraft's lawyer. Rather than continuing the matter, the trial court instructed Mr. Smithson's lawyer to telephone Mrs. Hoalcraft's lawyer and to instruct him to appear at the hearing.[13] Upon receiving the telephone call, Mrs. Hoalcraft's lawyer stated that the divorce case had settled late on January 3, 2000, and that he and his clients were meeting with the other parties to draft a final marital dissolution agreement and a final decree. He also informed Mr. Smithson's lawyer that, in light of their agreement to continue the matter, he had not prepared for the hearing, he had not arranged for a court reporter, and he was not properly dressed to appear in court. Even though Mr. Smithson's lawyer passed this information along to the trial judge, the trial judge insisted on proceeding with the motion and decided to set the final custody hearing for February 28, 2000.

Mrs. Hoalcraft informed the children earlier that she intended to come for them during the weekend of January 7-9, 2000. Accordingly, on January 4, 2000, the same day as the scheduled hearing on the motion to set filed earlier, Mr. Smithson filed an amended petition to modify custody. After pointing out that this court's decision in *Hoalcraft v. Smithson I* was not yet enforceable,[14] Mr. Smithson requested the trial court to prevent Mrs. Hoalcraft "from interfering with Father's temporary physical custody pending the final hearing in this cause or mandate from the Court of Appeals or Orders from the Supreme Court." The amended petition also asked the court to appoint a guardian ad litem.

Two days after the amended petition was filed, the trial judge entered an order on January 6, 2000. The trial court declined to enter a proposed order submitted by Mr. Smithson's counsel reflecting the outcome of the January 4 hearing. The order entered by the judge set the final custody hearing for February 28, 2000, but did not stop there. The trial court stated that "upon consideration of the amended petition, the Court on its own motion appoints . . . as guardian ad litem . . . " to report to the court on the best interests of the children.[15] On its own motion, the trial court also decided that this court's opinion in *Hoalcraft v. Smithson I* had somehow "converted counsel for the Plaintiff into a material witness on a crucial, contested issue in this case which has yet to proceed to a final

---

[13] The trial court apparently decided that Mrs. Hoalcraft's lawyer should have appeared to argue the motion. In a supplemental memorandum filed on May 5, 2000, the trial court stated in a footnote by "[b]y the time the motion to set was called, the basis for consent for a continuance did not exist. It ultimately appeared to the Court that Mr. Smithson and his counsel, both present at the call of the docket, still desired a future trial date to be set that day. It was proper for this Court to grant the motion under all circumstances." (Appendix 8-9)

[14] He recited that he "understands that the Order of the Court of Appeals will not be enforceable until 64 days after its entry and if Application for Permission to Appeal to the Supreme Court is sought then the Order of the Court of Appeals will be stayed until Order from the Supreme Court and/or remand to the Trial Court by the Court of Appeals."

[15] The certificate of service on the amended petition indicates it was mailed to Mrs. Hoalcraft's counsel on January 4. Therefore, it could not have been part of the hearing on January 4.

6

hearing."[16]  Accordingly, the trial court directed Mrs. Hoalcraft's counsel to "file a brief on the issue of whether he should be disqualified from representing Plaintiff any further in the trial court in this case pursuant to DR 5-102(A), it appearing that he has now been recognized as, accepted as, or deemed a material witness in this cause which is not final."  The trial court also set a hearing on the disqualification of Mrs. Hoalcraft's lawyer for January 18, 2000.

That January 6, 2000, order[17], entered two days after the filing of the amended petition, and within the time allowed for the filing of a Tenn. R. App. P. 11 petition, included the following footnote which is relevant to the next event in the litigation:

> The issues of custody, visitation and removal were to be "reviewed" approximately one year after entry of judgment of July 17, 1997.  The Tennessee Court of Appeals relied upon the testimony of Leta Hoalcraft's attorney, R.E. Lee Davies, concerning what "review" meant and thus there had yet to be a review of these issues before the petition for change of custody was filed on October 13, 1998.  As a result, the Tennessee Court of Appeals apparently determined that the word "review" does not mean what it traditionally is defined to mean in finding that the judgment of July 17, 1997, was final and not subject to review or revision under T.R.C.P. 54.02, as guided by the Tennessee Supreme Court's decision in *Fox v. Fox*, 657 S.W.2d 747 (Tenn. 1983).  To do this, the Court of Appeals has apparently sidestepped the traditional and historical rule that the Court only speaks through its minutes found in its Orders and not through hearsay testimony given only by a single attorney of record concerning what a judge may have said off the record.  If a T.R.A.P. 11 application is taken and granted, the Tennessee Supreme Court should correct what appears to this Court as plain error in accepting Mr. Davies's testimony concerning what the word "review" means in the judgment of July 17, 1997.

On January 10, 2000, Mrs. Hoalcraft's lawyer filed several responses to the January 6 order: a brief regarding his disqualification from the case; a motion to vacate the trial court's January 6, 2000 order; and a motion to dismiss Mr. Smithson's amended custody petition.  In addition, he filed  a motion requesting the trial judge to disqualify himself from the case asserting that the trial judge's impartiality might reasonably be questioned because (1) the trial judge had granted the motion to set and appointed a guardian ad litem without giving Mrs. Hoalcraft an opportunity to be heard, (2) the trial judge had arbitrarily set the final hearing for February 28, 2000 knowing that Mrs. Hoalcraft lived in Thailand, (3) the trial judge had publicly commented about this court's December 17, 1999 opinion, while the time for filing an application for permission to appeal had not expired, and had encouraged Mr. Smithson to request the Tennessee Supreme Court to "correct what appears to this Court as a plain error . . .," and (4) the trial judge had deprived Mrs. Hoalcraft of effective representation by threatening

---

[16]The "contested issue" to which the trial court was referring involved the finality of Judge Bell's July 17, 1997 order granting Mrs. Hoalcraft permission to relocate and denying Mr. Smithson's motion for change of custody.

[17]Appendix 1-2.

7

to disqualify her counsel on the eve of the final custody hearing.

The motion to vacate the January 6 order was based on the grounds (1) that Mrs. Hoalcraft's counsel had not been present at the January 4 hearing, because of the previously agreed-to continuance; (2) that "counsel for Mother had already informed counsel for Father that he wanted a hearing on the Motion to Set as he felt there were no dispositive issues remaining as a result of the Court of Appeals' Opinion;" (3) that the court had allowed the Amended Petition without providing notice and opportunity to be heard (the Amended Petition was mailed to Mrs. Hoalcraft's counsel on January 4, and the court's order responding to portions of it had been entered January 6); (4) that appointment of a guardian ad litem, as requested in the January 4 amended petition, had been granted without notice and an opportunity to be heard.

The motion to dismiss the amended petition was based on the grounds that (1) the issues of custody which were tried on January 4, 1999 and ruled on by the Court of Appeals were res judicata, therefore precluding Mr. Smithson from amending a petition which had been dismissed by the appellate court, and (2) no motion requesting leave to file and serve the amended petition had been filed.

Following a hearing on January 18, 2000, the trial court filed another memorandum on January 26, 2000.[18] The court explained that one issue before it was whether its January 15, 1999, order granting temporary custody to Mr. Smithson was a temporary order or a final order. The court determined that that order, which was the subject of this court's opinion in *Hoalcraft v. Smithson I*, was temporary. This conclusion resulted in the trial court's determination that Mr. Smithson was entitled to a final hearing on his original petition for change of custody. The trial court further determined that Mr. Smithson's amended petition for custody should be deemed to be "an amended and 'supplemental' petition or complaint", which requires a motion prior to its filing.[19] Because no motion had been filed with the amended complaint, the court ordered that its January 6, 2000 order setting the case for trial on the amended complaint should be vacated.

Finding, specifically, that "both parties are entitled to a final hearing or a final custody determination based on their former pleadings," the trial court invited Mr. Smithson to file a proper motion to supplement his pleadings regarding the custody issue. The trial court also postponed the final custody hearing set for February 28, 2000, to make sure that Mrs. Hoalcraft was provided with at least thirty days to file a response to the supplemental pleading and to prepare her defense. One week later, Mr. Smithson filed a "supplemental petition for modification of custody" and a motion seeking permission to file the supplemental pleading.

---

[18]Appendix 3-5.

[19]Mr. Smithson had filed a motion asking the court to allow filing of the Amended Petition for Modification of Custody on January 13, 2000, in response to one of the grounds raised in Mrs. Hoalcraft's motion to dismiss that amended petition.

In addition to pressing the trial court for a final custody hearing, Mr. Smithson decided to follow the suggestion in the trial court's January 6, 2000 order and to request the Tennessee Supreme Court to reverse this court's December 17, 1999 opinion. Even though there had been no objection or question regarding the response of Mrs. Hoalcraft's lawyer during the January 4, 1999 hearing to the trial court's questions about his conversations with Judge Bell during the summer of 1998, Mr. Smithson, mirroring the trial court's January 6, 2000 order, argued in his February 14, 2000 application for permission to appeal:

> The trial court, in July 1997, was obviously concerned about the issues presented enough so that he set the case for review. This was not a final order. The Court of Appeals cites in their opinion the "testimony" of the Mother's attorney that he called Judge Bell in the summer of 1998 and was told "hearsay, hearsay, hearsay,". Not only is what Judge Bell allegedly told Mother's attorney hearsay, but mother's attorney is prohibited from testifying in a matter in which he represents the party and furthermore should not engage in ex parte communications with a judge. D.R. 5-101.
>
> * * *
>
> Furthermore, the Court of Appeals on page 4 of their opinion states that Ms. Hoalcraft's attorney did contact the judge to find out whether the parties were supposed to reappear for review and that Judge Bell indicated that review was unnecessary unless there was a problem regarding custody. Father would submit to the court that statements of counsel are not evidence nor can an attorney testify in a matter where he is representing the party to the lawsuit. Additionally, ex parte communications with a judge are inappropriate. D.R. 5-101(B). It was improper to take the statements of counsel as factual and rely upon those facts in holding that the review status of the case somehow allowed the order to be final as to issues regarding the children.

By making this argument, Mr. Smithson squarely presented the question of this court's determination that Judge Bell's July 17, 1997 order was final to the Tennessee Supreme Court. He also presented to the Supreme Court the issue of Mrs. Hoalcraft's attorney's statements in response to the trial court's questioning.

On February 29, 2000, the Western Section filed an opinion in *Hoalcraft v. Smithson II*, reversing the trial court's decision that Mrs. Hoalcraft was willfully and voluntarily unemployed and that she should be required to pay Mr. Smithson $554 per month in child support. The court determined that the trial court "should have determined that, under the unique circumstances of the case at bar, Mrs. Hoalcraft is unable to earn a living and therefore is not required to pay child support to Mr. Smithson." In addition, the court affirmed the trial court's decision to grant Mr. Smithson a credit against his child support arrearage for the cost of the airline tickets he purchased to enable the

9

children to return for visitation in the summer of 1998. *Hoalcraft v. Smithson*, 2000 WL 225583, at *2-3. Neither Mr. Smithson nor Mrs. Hoalcraft appealed from this decision.

The record does not reflect any further actions in the trial court after the January 26, 2000 order until May 5, 2000, when the trial court filed a "supplemental memorandum" addressing the issues raised in Mrs. Hoalcraft's January 10, 2000 motions.[20] First, the court declined to dismiss Mr. Smithson's amended or supplemental petition for change of custody. Second, even though it had already continued the February 28, 2000 hearing to a later date, the trial court justified its decision to set a final custody hearing without giving Mrs. Hoalcraft a chance to be heard by stating that "it was a proper matter for the Court's discretion to set the case for a final hearing after the motion to set was called on the Court's docket . . . regardless of whether Mrs. Hoalcraft was given an opportunity to be heard in opposition to setting the same." Third, the trial court disqualified Mrs. Hoalcraft's lawyer from continuing to represent her by concluding that the lawyer's conversation with Judge Bell during the summer of 1998 was an ex parte communication in violation of Tenn. S. Ct. R. 10, Canon 3B.(7). The trial court also concluded that "the act of Mr. Davies testifying[21] while remaining counsel for Mrs. Hoalcraft clearly contravenes . . . [Tenn. S. Ct. R. 8, DR 5-102(A)]." Finally, the trial court declined to recuse itself from the case. In the order accompanying this memorandum, the trial court gave Mrs. Hoalcraft forty-five days to obtain new counsel and to answer Mr. Smithson's supplemental petition.[22]

On May 15, 2000, the Tennessee Supreme Court declined to review this court's decision in *Hoalcraft v. Smithson I.* The mandate was issued on May 31, 2000, and the case was returned to the trial court for further proceedings consistent with this court's December 17, 1999 opinion.

On June 2, 2000, Mr. Smithson filed a motion to set a final hearing on his petition to change custody. One week later, on June 9, 2000, Mrs. Hoalcraft filed an Tenn. R. App. P. 10 application for an extraordinary appeal requesting this court to review the trial court's decisions to relitigate the custody issue, to disqualify her lawyer, and to deny her request that he recuse himself from the case. On June 13, 2000, this court directed Mr. Smithson to respond to Mrs. Hoalcraft's application. While the appellate proceedings were pending, the trial court conducted a hearing on Mr. Smithson's motion to set and entered an order continuing the motion. On June 23, 2000, this court granted Mrs. Hoalcraft's application for an extraordinary appeal and stayed all proceedings in the trial court.

---

[20]Appendix 6-19.

[21]The "testimony" the trial court is referring to were the answers the lawyer gave during the January 4, 1999 hearing in response to the trial court's questions about the basis for his assertion that the July 17, 1997 order was a final order. (Appendix 30-31)

[22]Four days later, on May 9, 2000, the trial court filed an amended order and an "amended supplemental memorandum" which essentially duplicated its order and supplemental memorandum filed on May 5, 2000. The apparent purpose of the amended supplemental memorandum was solely to add a citation to an unpublished decision by this court involving a separate, unrelated divorce case in which Mrs. Hoalcraft's lawyer, while representing another client, had asserted that "a court speaks only through its minutes."

## 1. The Res Judicata Effect of the December 17, 1999 Opinion of this Court

The first two requests for relief sought by the appellant are:

(1) That this Court find the order of January 15, 1999 was a final order with regard to all issues raised by Mr. Smithson's original Petition to Change Custody, and this Court's opinion of December 17, 1999 reversing same is res judicata.

(2) That this Court prohibit the trial court from litigating any facts prior to the order of January 15, 1999.

The genesis of most of the problems before the Court in this appeal is the refusal of the trial judge to recognize that the order entered by his predecessor, Judge Bell, in July of 1997, allowing the custodial parent, Mrs. Hoalcraft, to remove the minor children with her to Thailand, and denying Mr. Smithson's request for a change of custody because of the proposed relocation, was a final judgment. In addition, the procedural posture of the case has been complicated by the trial court's treating the issues raised in Mr. Smithson's October 1998 petition for change of custody as anything other than res judicata. This approach is exemplified by the trial court's determination that both parties were entitled to a hearing on their original pleadings.

At the time Judge Bell entered the order of July 17, 1997 allowing Mrs. Hoalcraft, who had been the custodial parent of the children since the divorce in 1988, to move with her husband and take the children to Thailand because of Mr. Hoalcraft's work assignment, he sua sponte said the case would be reviewed in the summer of 1998 when Mrs. Hoalcraft and the children would return to Tennessee to accommodate the visitation schedule with their father. Judge Bell did not set a specific date for a review and neither party attempted to set a review in the summer of 1998. It was Mrs. Hoalcraft who called the attention of Mr. Davies to the provision in the July 17, 1997 order referring to a review. Mr. Davies called Judge Bell near the time of Mrs. Hoalcraft's scheduled return to Thailand with the children to inquire about a review. Judge Bell informed him that there was no need for a review unless there was a problem with custody. Mr. Davies so informed his client and she and the children went back to Thailand.

Conspicuous in its absence from Judge Heldman's exhaustive memoranda, is the clearly established fact that at no time did counsel for Mr. Smithson, by motion, petition, agreement with opposing counsel, or, by any other method seek a "review" from Judge Bell in the summer of 1998. It was not until October 13, 1998, 43 days after Judge Bell had left office and Judge Heldman had succeeded him, (and Mrs. Hoalcraft and the children had returned to Thailand), that Mr. Smithson filed his Application for Change of Custody. He sought an order that the children be interviewed by Judge Heldman, and Judge Heldman compelled Mrs. Hoalcraft to return with the children so that they could submit to the January 3, 1999 interview with Judge Heldman. After this interview, Judge Heldman set for trial the October 13, 1998 petition for change of custody on the following day, January 4, 1999. The result of this January 3rd and 4th, 1999 hearing on the merits of the October 13, 1998 petition by Mr. Smithson for change of custody were reflected in the order of Judge Heldman on January 15, 1999, wherein he held that the July 17, 1997 judgment of Judge Bell was not a final judgment and a

11

final adjudication of custody, and further held that custody would be changed immediately from Mrs. Hoalcraft to Mr. Smithson. In the order of January 15, 1999, Judge Heldman specifically declared that the judgment reflected therein was a final judgment pursuant to the provisions of Tennessee Rule of Civil Procedure 54.02. Mrs. Hoalcraft thereupon appealed.

While Judge Heldman was mistaken regarding the legal effect of Judge Bell's July 17, 1997 order, the order's vague reference to a "review docket" provides a plausible basis for questioning whether Judge Bell's order was final. However, the issue was addressed authoritatively when this court, in the opinion authored by Judge Highers on December 17, 1999, made crystal clear that the July 17, 1997 order by Judge Bell was in fact a final order. This court said:

> From our reading of the record, it is clear that the order of July 1997[23] was intended as a final order. It disposed of all issues before the Court at that time. It granted Ms. Hoalcraft's petition regarding moving the children to Thailand, and it dismissed Mr. Smithson's custody counter-claim. We find that the simple act of placing the case on the review docket does not prevent the order from being considered final.

*Hoalcraft v. Smithson*, 19 S.W.3d at 828.

The July 17, 1997 order, being final,[24] made it incumbent upon Mr. Smithson, in order to sustain his October 13, 1998 petition for change of custody, to prove a material change in circumstances. This he did not do and this Court so held. The December 17, 1999 opinion of this court reversed Judge Heldman's January 15, 1999 holding and restored the custody of the children to Mrs. Hoalcraft.

Likewise, in ruling on the merits of the October 13, 1998 Petition for Change of Custody filed by Mr. Smithson, this Court held: "Nothing that occurred between July 1997 and January 1999 would qualify as an exigency under this standard. Therefore, for the reasons stated above, we find that the trial court erred on this issue. There was not a material change in circumstances sufficiently compelling to warrant a change in custody." *Hoalcraft v. Smithson*, 19 S.W.3d at 829-30.

The trial court's ruling of January 15, 1999 and this court's reversal of that ruling were based upon Mr. Smithson's original petition and upon proof at that hearing regarding circumstances up to the date of the hearing. Those issues having been heard and decided, they could not be re-litigated. Thus, although this court's judgment, including the directive to return the children to the mother's custody, did not become final until the Supreme Court denied permission to appeal, *see Brooks v. Carter*, 993 S.W.2d 603 (Tenn. 1999), any issues raised or which could have been raised in the original petition and hearing are not subject to re-examination, and were not so subject when Mr.

---

[23]In the opinion of this court of December 17, 1999, this order is referred to as being entered July 3, 1997. In Judge Heldman's memoranda it is said to have been entered July 17, 1997. The record in the prior appeal shows that the hearing was on July 3, 1997 and the order reflecting the results of such hearing was entered July 17, 1997.

[24]Mr. Smithson did not appeal from the July 17, 1997 order.

12

Smithson filed his motion to set his original petition for a final hearing.

When the Supreme Court denied the Tenn. R. App. P. Rule 11 application, this Court's opinion of December 17, 1999 thus became the law of the case, foreclosing and excluding any complaint, constitutional or otherwise, as to the issues addressed and decided in the appellate court's opinion. *Gill v. Godwin*, 442 S.W.2d 61, 662-63 (Tenn. Ct. App. 1967); *Cook v. McCullough*, 735 S.W.2d 464, 469 (Tenn. Ct. App. 1987). The trial court does not have the authority to modify or revise the appellate court's opinion. *McDade v. McDade*, 487 S.W.2d 659, 663 (Tenn. Ct. App. 1972).

When Mr. Smithson filed his first pleading after this court's decision, he asked the trial court to set a date for "final hearing on the issue of custody." Because the award of custody was long final, and because the issues raised in Mr. Smithson's original October 1998 petition for change of custody had been litigated and determined by the trial court and this court, Mrs. Hoalcraft's response was correct: there were no issues remaining for another hearing. Although the trial court labored hard to justify his setting of a "final hearing" because the January 1999 order had been for "temporary custody", that setting overlooks the fact that no issues heard at the January 1999 hearing could be re-litigated and, in effect, the Court of Appeals had dismissed Mr. Smithson's petition on the facts alleged therein and the proof at that hearing. Whether or not the January 1999 order giving Mr. Smithson custody was temporary, only circumstances occurring after that order could form the basis of a new hearing and decision on change of custody. Because Mr. Smithson, at the point he asked the trial court to set a final hearing, had alleged no facts occurring after the January 15, 1999 trial court order, there was no basis for setting a hearing.

Thus, only events occurring subsequent to January 15, 1999 are relevant to any issues to be further heard in this case. Mr. Smithson is and was free to pursue a modification of custody on the basis of circumstances occurring since that time. To the extent Mr. Smithson's Supplemental Petition for Modification of Custody alleged a change in circumstances warranting a change of custody, those issues were subject to further litigation, although a new petition, rather than an attempt to supplement the original petition, may have been more appropriate.

We find that no issues raised by Mr. Smithson's original petition can be re-litigated. In any further proceedings, facts considered and issues raised in that petition and the January 1999 hearing are res judicata.

## 2. The Disqualification of R.E. Lee Davies as Attorney for Mrs. Hoalcraft

We take judicial notice that Honorable R.E. Lee Davies was elected in August of 2000 as Circuit Judge of Division II of the Twenty-First Judicial District and is no longer able to represent Mrs. Hoalcraft. However, we do not find that this issue regarding his disqualification is moot because the trial court's finding that Mr. Davies has acted unethically places a public stain on his reputation and professional standing. This stain will become permanent if we do not address the matter.

Judge Heldman correctly stated that trial judges need not ignore ethical violations occurring in their courts. Tenn. S. Ct. R. 10, Canon 3 D.(2); *Bouton v. City Nat'l Bank*, 1984 Shelby No. 16, WL

13

273983, at *9 (Tenn.Ct.App. June 8, 1984) (rehearing denied Sept. 11, 1984).  The courts have a broad range of options to insulate trials from ethical taint.  *In re Ellis*, 822 S.W.2d 602, 605 (Tenn. Ct. App. 1991); *Hilton v. Miller*, No. 03A01-9102-CV-00033 1991 WL 261872, at *3 (Tenn.Ct.App. Dec. 13, 1991) (No Rule 11 application to appeal filed); *King v. King*, No. 89-46-II, 1989 WL 122981, at *12 (Tenn.Ct.App. Oct. 18, 1989) (Koch, J., concurring) (No Rule 11 application to appeal filed).

Disqualifying a party's lawyer is the most drastic remedy because it causes delay, increases costs, and deprives a litigant of its attorney of choice.  Accordingly, disqualification is discouraged, *Lemm v. Adams*, 955 S.W.2d 70, 74 (Tenn. Ct. App. 1997), and the courts should be extremely reluctant to disqualify a lawyer and should do so only when no other practical alternative exists. *Whalley Dev. Corp. v. First Citizens Bancshares, Inc.*, 834 S.W.2d 328, 331-32 (Tenn. Ct. App. 1992); *In re Ellis*, 822 S.W.2d at 605.

In this case, it is clear that the trial judge disqualified Mrs. Hoalcraft's lawyer when there was no objective basis to do so.  There is simply no basis for concluding that maintaining the fairness of the proceedings required such a drastic remedy or that the lawyer engaged in any conduct that was ethically questionable.

One has to but carefully consider the chronology of events and analyze the maze of verbiage permeating the appendix to this opinion to determine the total lack of merit to the arbitrary action of the trial court in disqualifying Mr. Davies.

First of all, more than a year before Judge Heldman took office, his predecessor, Honorable Henry Denmark Bell, on July 17, 1997, entered an order authorizing Mrs. Hoalcraft to take the children to Thailand and denying Mr. Smithson's counter petition for change of custody on the ground that there had been no material change in the children's circumstances.  This order further provided that the case "shall be placed on the review docket in the summer of 1998" when Mrs. Hoalcraft would return with the children from Thailand to enable them to have a month long visitation with Mr. Smithson.  Mrs. Hoalcraft returned with the children in the summer of 1998 and visitation with Mr. Smithson began.

Judge Bell did not call the case for review in the summer of 1998.  Mr. Smithson did not seek a review in the summer of 1998.  It was Mrs. Hoalcraft who brought to the attention of Mr. Davies the provision of the July 17, 1997 order by Judge Bell relative to a review.  It was at this point with the summer of 1998 in progress and the return of Mrs. Hoalcraft with the children to Thailand impending that Mr. Davies called Judge Bell to ask what to do about a review.  It is important to note that neither Mr. Smithson nor his competent counsel made any effort at all to schedule a review in the summer of 1998.  Judge Bell retired August 31, 1998, and Judge Heldman immediately succeeded him.

Forty-three days later, well after Mrs. Hoalcraft had returned to Thailand with the children,[25] Mr. Smithson filed a petition to change custody asking therein that Judge Heldman interview the

---

[25]And, we note, after Mrs. Hoalcraft had taken action to enforce Mr. Smithson's child support obligation.

14

children. Judge Heldman set the interview with the children for January 3, 1999 and a dispute arose between the parties as to whether or not the July 17, 1997 order of Judge Bell was a final order or was simply an interim order. Thus, the case came on for hearing before Judge Heldman on January 4, 1999. At this point Mr. Davies had "testified" to absolutely nothing.

In his supplemental memorandum of May 5, 2000[26], Judge Heldman reconstructs in part the events that had occurred on January 4, 1999. In this reconstruction[27] the court states in part:

> The custody and relocation Order of judgment of July 17, 1997, states in part: "This case *shall* be placed on the review docket in the summer of 1998 when Plaintiff returns from Thailand with the children." (Emphasis added). At the <u>pendente lite</u> hearing of January 4, 1999, the Court was called upon to determine the impact of the failure of the case being placed on the "review" docket on the finality of the prior custody determination. The following exchange occurred:

>> THE COURT: Mr. Davies, what do you understand the statement in that prior order that was entered, "This case shall be placed on the review docket in the summer of 1998, when plaintiff returns from Thailand with the children"?

>> You made presentation to the Court about the last time we were in court on this case. I just wanted to give you an opportunity to state exactly what you understand as to why there was not a review at that time. . . .

Thus, it is that the first, last and only time Mr. Davies "testifies" is in response to a direct inquiry of the court on January 4, 1999. The trial judge knew on January 4, 1999, following Mr. Davies response to his question, everything that the judge claimed over one year later was unethical conduct on the part of Mr. Davies.

In his order of May 5, 2000 disqualifying Mr. Davies, the trial court says,[28]

> Therefore, it was proper for this Court on its own motion to issue the show cause portion of its Order of January 6, 2000, for this Court must respond to, correct or at least address any apparent violation of any Disciplinary Rule which occurs in any case before it. Canon 3D.(2) of the Code of Judicial Conduct states in part: "*A judge who receives information indicating a substantial likelihood that a lawyer has committed*

---

[26]Appendix 6-19.

[27]Appendix 10-11.

[28]Appendix 15.

*a violation of the Code of Professional Responsibility should take appropriate action."*
(Emphasis added).

Thus, armed on January 4, 1999 with every particle of information he would ever know concerning alleged unethical conduct on the part of Mr. Davies this trial court waited twelve months to act on the information. The only thing of significance on the disqualification issue that intervened between January 4, 1999 and the trial court's show cause order of January 6, 2000 was the December 17, 1999 opinion of this court in *Hoalcraft v. Smithson*, 19 S.W.3d 822 (Tenn.Ct.App. 1999).

In the immediate wake of this Court's opinion of December 17, 1999, the trial court in its January 6, 2000 order[29] states in part:

> The Court finds that the appellate court opinion converted counsel for Plaintiff into a material witness on a crucial, contested issue in this case which has yet to proceed to a final hearing.

Thus, in synopsis:

1. Judge Bell holds a hearing on July 3, 1997 on the merits of a petition by Mrs. Hoalcraft to relocate with the children to Thailand and a counter petition by Mr. Smithson for a change of custody.
2. On July 17, 1997, Judge Bell sustains Mrs. Hoalcraft's petition and denies Mr. Smithson's petition.
3. In the July 17, 1997 order, Judge Bell holds that the case shall be placed on the review docket in the summer of 1998.
4. Judge Bell does not affirmatively act to set a review in the summer of 1998.
5. Counsel for Mr. Smithson does not seek a review in the summer of 1998.
6. As the summer draws to a close Mrs. Hoalcraft reminds Mr. Davies of the review provision of the July 17, 1997 order.
7. Mr. Davies calls Judge Bell to inquire about a review.
8. Judge Bell responds that there is no need for a review unless there is a problem.
9. Mrs. Hoalcraft returns to Thailand with the children.
10. Judge Bell retires August 31, 1998.
11. Judge Heldman assumes office September 1, 1998.
12. Mr. Smithson files on October 13, 1998 a petition for change of custody with a request that Judge Heldman interview the children.
13. Judge Heldman orders an interview of the children for January 3, 1999, which becomes a hearing on a change of custody.
14. Mr. Davies, acting for Mrs. Hoalcraft, takes the position that the July 17, 1997 order from Judge Bell, was a final order and counsel for Mr. Smithson takes

---

[29]Appendix 1.

16

a contrary position.

15. On January 4, 1999, in response to a specific inquiry by Judge Heldman, Mr. Davies relates the events of the summer of 1998 concerning the "review docket".

16. The fact, as well as the content, of this recitation by Mr. Davies discloses to Judge Heldman everything done by Mr. Davies that the court later finds to require disqualification.

17. Armed with all knowledge he will ever have about the conduct of Mr. Davies, Judge Heldman does absolutely nothing between January 4, 1999 and the January 6, 2000 show cause order.

In the trial court's thinking, the conduct of Mr. Davies becomes unethical ipso facto by nothing Mr. Davies does or says but rather by the opinion of this Court of December 17, 1999.

In ordering disqualification from future proceedings, the trial judge himself stated that it was proper for him to "respond to, correct, or at least address any apparent violation of any Disciplinary Rule which occurs in any case before it." This statement reflects the trial court's misunderstanding of its role under Tenn. S. Ct. R. 10, Canon 3 D.(2). That canon specifically instructs judges who receive information indicating a substantial likelihood that a lawyer has committed an ethical violation to take "appropriate action" and indicates that the "appropriate action" should generally be to "inform the appropriate authority." Thus, possible ethics violations surfacing during litigation should generally be referred to the disciplinary machinery established by Tenn. S. Ct. R. 9. Trial courts should not go further unless the ethical violation has tainted or threatens to taint a trial's fairness. *King v. King*, 1989 WL 122981, at *12 (Koch, J., concurring).

The purpose of the rule on lawyer disqualification when the lawyer ought to be a witness is to protect the client in the event the lawyer's testimony is needed at trial. *Oakley v. Daniels*, 840 S.W.2d 367, 371 (Tenn. Ct. App. 1992). The Code itself includes an exception to disqualification when, during the course of litigation, an attorney learns that he or she may be called as a witness by the opposing party. In that situation, "the lawyer may continue the representation until it is apparent that the testimony is or may be prejudicial to the client." DR 5-102(b); *Whalley Development Corporation v. First Citizens Bancshares*, *Inc.*, 834 S.W.2d at 330.

The rules and principles regarding attorney disqualification lead to two conclusions relevant here. First, because there was absolutely no likelihood that Mr. Davies would be required to testify in the ongoing proceedings, there was no basis to deprive Mrs. Hoalcraft of her longtime counsel in the future proceedings the trial court was in the process of setting. The issue regarding the finality of Judge Bell's July 17, 1997 order was finally and definitively put to rest by this court when we held that it was a final order. *Hoalcraft v. Smithson*, 19 S.W.3d at 828. The Tennessee Supreme Court has not reversed this court's decision on that point, and, in fact, this court's decision became the law of the case when the Tennessee Supreme Court declined to review the decision. Thus, it will be inappropriate and unnecessary to raise the issue again in later custody proceedings. Accordingly, Mrs. Hoalcraft's lawyer would never have been called upon to "testify" as a witness in the later custody

proceedings. Since there can be no further legal or factual inquiry into that issue, Mr. Davies could never have been called upon to "testify" further about this matter. Thus, under these facts, there was no prospect that Mr. Davies "would be called as a witness on behalf of the client." Therefore, the trial court abused its discretion when it used this ground to disqualify Mr. Davies.

From this vantage point, we must conclude that Judge Heldman disqualified Mr. Davies not to protect the future custody proceedings from ethical taint, but rather to punish Mr. Davies for what the trial court perceived to be unethical conduct. We disagree that there was any ethical violation. The second conclusion we draw from the principles discussed above is that, even if Mr. Davies's responses to the trial court's questioning can be considered testimony, those responses did not violate any provision of the Code of Professional Responsibility.

In this situation, the attorney was asked a question by the trial court during a hearing; the attorney responded as an officer of the court. No motion was made at that time for disqualification of the lawyer, and the issue simply did not arise. We note that attorneys are often called upon, during argument or in other court proceedings, to answer questions from the judge, particularly about procedural and related issues.[30] To subject an attorney's client to potential motions to disqualify that attorney on the basis of such interaction is not reasonable. Attorneys, as officers of the court, must be able to report to the court on various procedural issues and actions taken by parties and counsel. We find nothing unethical about such practice, and certainly no basis for disqualification.

Mr. Davies has sustained himself during this ordeal with admirable fortitude and restraint in keeping with the high standards expected of a member of the bar. The action of the trial judge in disqualifying Mr. Davies as counsel for Mrs. Hoalcraft is reversed.

### 3. The Disqualification of the Trial Judge

Mr. Smithson argues that this issue is moot because the trial judge has informed the lawyers for the parties that he intends to recuse himself from this case because he and Mr. Davies are now judicial colleagues. The record does not contain an order of recusal entered by Judge Heldman. We have been supplied this information in Mr. Smithson's Tenn. R. App. P. 14 motion to consider post-judgment facts wherein Mr. Smithson's lawyer represents to the court that all attorneys in the case have been made aware that due to the election of Judge Davies to Division II of the Twenty-First Judicial District and his sharing of office space with Judge Heldman that Judge Heldman will recuse

---

[30]For example, as the facts recited earlier in this opinion demonstrate, at the January 4, 2000 hearing on the motion to set, the trial court directed Mr. Smithson's counsel to communicate with Mr. Davies. She did so and reported back to the court. Similarly, the trial court's order of June 20, 2000, relates that at an apparent hearing on Mr. Smithson's motion to set the matter for trial, counsel for Mr. Smithson "informed the Court that Michael Binkley, Esq., now represents Mother and that the parties had agreed to continue the motion to set because the entire case is expected to settle . . . ." The trial court apparently was not troubled about these statements of counsel and not concerned that these statements converted counsel into a witness. We agree the trial court should not have been concerned in these instances. Neither should it have concluded that Mr. Davies acted unethically in the January 4, 1999 hearing or that his statements then disqualified him from later participation in the case.

himself in the case.

Further, Mr. Smithson's attorney represented to the court during oral argument that "Judge Heldman had a conversation between myself and Mr. Binkley,[31] which he initiated, and informed us that he would not be hearing this case any longer . . . if this does go back for a full hearing, I have every belief that this will be assigned to either Judge Easter or Judge Harris or it could be assigned to a senior status judge."

A trial judge contemplating recusal is not something we can consider as a post-judgment fact simply because it is not yet a fact as far as the record shows. Notwithstanding this evidentiary shortcoming Mr. Smithson's lawyer is an officer of this court and for the purposes of this opinion we conclude that Judge Heldman has in fact told the attorneys for the parties that he intends to recuse himself from this case even though he has not actually done so.

It is altogether proper that Judge Heldman should recuse himself since he and Judge Davies now share office space. It is also clear that Judge Heldman should recuse himself because his conduct in this case, when viewed as a whole, provides a basis for a person of ordinary prudence in the judge's position, knowing all the facts known to the judge, to reasonably question Judge Heldman's impartiality. *Davis v. Liberty Mut. Ins. Co.*, 38 S.W.3d 560, 564 (Tenn. 2001).

The basis for our conclusion that Judge Heldman's impartiality can reasonably be questioned lies in his repeated misapplication of fundamental, rudimentary legal principles in ways that favored Mr. Smithson substantively and procedurally. *See Givler v. Givler,* 964 S.W.2d 902 (Tenn.Ct.App. 1997).

Among these decisions are: (a) his decision to place the burden on Mrs. Hoalcraft, the long term custodial parent, of proving the children would be harmed if custody were changed to Mr. Smithson, (b) his decision to require Mrs. Hoalcraft to bring the children from Thailand to Tennessee in December 1999 rather than waiting to interview them during their regular summer visitation, (c) his decision to conduct a "temporary" custody hearing in January 1999, on less than one day's notice, when the circumstances did not require it, (d) his misapplication of the burden of proof by requiring Mrs. Hoalcraft to prove that the children would be harmed if they remained with their father, (e) his decision that Mrs. Hoalcraft was voluntarily and willfully unemployed in light of the undisputed evidence that she could not legally work for wages while living in Thailand, (f) his decision to require Mrs. Hoalcraft to pay Mr. Smithson child support, (g) his decision to address the substance of Mr. Smithson's motion to set in the absence of Mrs. Hoalcraft's lawyer after the parties' lawyers had agreed to continue the matter, (h) his decision to grant relief, including appointment of a guardian ad litem for the children, within two days of the motion requesting it, without notice to Mrs. Hoalcraft, (i) his use of the order granting that relief to suggest to counsel for Mr. Smithson issues which should be raised in an application for appeal to the Supreme Court, (j) his decision to set a hearing on a pleading when all the issues raised in that pleading had been litigated in his court a year earlier, (k) his

---

[31]Honorable Mike Binkley of the Nashville Bar succeeded Mr. Davies as counsel for Mrs. Hoalcraft.

initially setting such hearing upon short notice when Mrs. Hoalcraft was outside the country and when the judge was considering disqualifying her counsel, and (l) his decision to disqualify Mrs. Hoalcraft's lawyer without reasonable cause.

While none of these decisions, viewed individually, provides a basis to question Judge Heldman's impartiality, their cumulative effect prompts an objective concern regarding his impartiality. We assume from the representations made to this court that Judge Heldman will in fact recuse himself from further participation in this case. Otherwise, he is disqualified and the case will be assigned on remand to another judge of the Twenty-First District.

### 4. The Remand of the Case and Further Proceedings

The present posture of this case is that Mrs. Hoalcraft has full custody of the minor children of the parties pursuant to this court's opinion of December 17, 1999, and such opinion is res judicata of such custody issue. There remains pending for disposition the supplemental petition for modification of custody filed in the trial court by Mr. Smithson on February 2, 2000. Hearing on the merits of this petition after remand, and any other proceedings on remand, are limited to events occurring subsequent to January 15, 1999. At such proceeding Mr. Smithson will have the burden of proving (1) that the children's circumstances have changed materially, (2) that these changed circumstances arose after January 15, 1999, (3) that these changes could not reasonably have been anticipated at the time of the January 15, 1999 order was entered in the trial court, (4) that these changed circumstances materially affected the children in some way, and (5) if such changed circumstances exist then Mr. Smithson must establish that he is currently comparatively more fit than Mrs. Hoalcraft to be the custodial parent.

Any hearing on remand will be held in accordance with settled rules of law among which the following principles are controlling. Because of the importance placed on stability and continuity of placement,[32] there is a strong presumption in favor of an existing custody decision. *Taylor v. Taylor*, 849 S.W.2d at 332; *Smithson v. Eatherly*, No. 01A01-9806-CV-00314, 1999 WL 548586, at *3 (Tenn. Ct. App. July 29, 1999)(No Tenn. R. App. P. 11 application filed). In fact, a custody decision, once made and implemented, is res judicata upon the facts in existence or reasonably foreseeable when the decision was made. *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997).

Life in contemporary society is, however, rarely static. Accordingly, our statutory and decisional law empowers the courts to alter custody arrangements when intervening circumstances require modifications. Tenn. Code Ann. § 36-6-101(a)(1)(Supp. 2000)(stating that custody decrees are "subject to such changes or modification as the exigencies of the case may require"). Thus, the courts may modify an existing custody arrangement when required by unanticipated facts or

---

[32]*Taylor v. Taylor*, 849 S.W.2d 319, 328 (Tenn. 1993); *Gorski v. Ragains*, No. 01A01-9710-GS-00597, 1999 WL 511451, at *4-5 (Tenn. Ct. App. July 21, 1999) (No Tenn. R. App. P. 11 application filed); *see also* National Interdisciplinary colloquium on Child Custody, *Legal and Mental Health Perspectives on Child Custody Law: A Diskbook for Judges* § 5:1, at 51 (1998).

subsequently emerging conditions. *Smith v. Haase*, 521 S.W.2d 49, 50 (Tenn. 1975); *Adelsperger v. Adelsperger*, 970 S.W.2d at 485. In the interests of stability in the child's life, a court should not alter an existing custody arrangement until (1) it is satisfied that the child's circumstances have changed in a material way since the entry of the presently operative custody decree, (2) it has carefully compared the current fitness of the parents to be the child's custodian, and (3) it has concluded that changing the existing custody arrangement is in the child's best interests. *Gorski v. Ragains*, 1999 WL 511451, at *3.

There are no bright line rules for determining when a change of circumstances will be deemed material enough to warrant changing an existing custody arrangement. *Taylor v. Taylor*, 849 S.W.2d at 327; *Solima v. Solima*, 7 S.W.3d 30, 32 (Tenn. Ct. App. 1998). These decisions turn on the unique facts of each case. As a general matter, however, the following principles illuminate the inquiry. First, the change of circumstances must involve the child's circumstances rather than those of either or both parents. *White v. White*, No. M1999-00005-COA-R3-CV, 1999 WL 488477, at *3 (Tenn. Ct. App. Dec. 10, 1999)(No Tenn. R. App. P. 11 application filed); *McCain v. Grim*, No. 01A01-9711-CH-00634, 1999 WL 820216, at *2 (Tenn. Ct. App. Oct. 15, 1999)(No Tenn. R. App. P. 11 application filed). Second, the changed circumstances must have arisen after the entry of the custody order sought to be modified. *Turner v. Turner*, 776 S.W.2d 88, 90 (Tenn. Ct. App. 1988). Third, the changed circumstances must not have been reasonably anticipated when the underlying decree was entered. *Adelsperger v. Adelsperger*, 970 S.W.2d at 485. Fourth, the circumstances must affect the child's well-being in some material way. *Geiger v. Boyle*, 1999 WL 499733, at *3; *Dalton v. Dalton*, 858 S.W.2d 324, 326 (Tenn. Ct. App. 1993).

**Conclusion**

1. All actions of the trial court taken subsequent to the opinion in this court of December 17, 1999 are reversed and custody of the minor children is vested in Mrs. Hoalcraft pursuant to *Hoalcraft v. Smithson*, 19 S.W.2d 828 (Tenn. Ct. App. 1999).

2. The order of the trial court disqualifying Honorable R. E. Lee Davies as attorney for Mrs. Hoalcraft is reversed and of no force and effect held.

3. On the assumption that Judge Heldman has recused himself from this case it will be assigned on remand to another judge in the Twenty-First Judicial District. Otherwise, Judge Heldman is by this court disqualified in all further proceedings in this case and on remand the case will be assigned to another judge in the Twenty-First Judicial District.

4. The merits of the supplemental petition for modification of custody filed by Mr. Smithson on February 2, 2000 will be addressed on remand and all other proceedings deemed necessary and proper by the newly assigned trial judge may be addressed in conformity to this opinion.

The case is remanded to the Circuit Court of Williamson County for further proceedings not inconsistent with this opinion. The guardian ad litem is relieved with reasonable fees for any services rendered to this date assessed to Mr. Smithson. This is without prejudice to the right of the judge to

21

whom the case is assigned to make his own decision as to the need for a guardian ad litem in future proceedings.

Costs of this appeal are assessed to Mr. Smithson.

_____
WILLIAM B. CAIN, JUDGE